UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re LEXAR MEDIA, INC. SECURITIES LITIGATION

No. C-04-2013 SC

ORDER RE: DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## I. INTRODUCTION

On October 29, 2004, Lead Plaintiffs ("Plaintiffs") for the above-captioned class action filed a Consolidated Amended Class Action Complaint ("Amended Complaint"). Defendants Lexar Media, Inc., Eric B. Stang, and Brian T. McGee ("Defendants") have now moved for dismissal. For the reasons articulated below, this Court GRANTS Defendants' Motion with respect to all claims and also GRANTS Plaintiffs 30 days from the date of this Order to amend their complaint.

## II. BACKGROUND

Lexar Media, Inc. ("Lexar") is a designer, marketer, and licensor of removable flash-based digital storage media and related products. Amended Complaint at 1. Defendant Eric B. Stang is Lexar's Chairman, President, and Chief Executive Officer. Id. at 3. Defendant Brian T. McGee is Lexar's Chief Financial

Officer. Id. On April 15, 2004, after a period of rapid growth, Lexar surprised the investing community by announcing that steep price declines for its main products would negatively impact its net income. Id. at 2. Lexar's stock fell by approximately one third following the announcement. Id.

Plaintiffs filed their Amended Complaint on October 29, 2004. The Amended Complaint puts forth two causes of action. The first is brought against all Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934. The second is brought against the Individual Defendants pursuant to Section 20(a) of the Act. The class period runs from October 16, 2003 to April 16, 2004.

The allegations underlying both claims are generally the same. Plaintiffs allege that during the class period Lexar and the Individual Defendants falsely encouraged the investing public to believe that Lexar was insulated from the impact of declining prices. Specifically, Plaintiffs allege, "Rather than disclose these facts to the public, Defendants, during the Class Period, continued to conceal the truth and instead publicly stated price declines for its products would not occur and the second quarter of 2004 would be strong." Id. at 6. Plaintiffs allege that the Individual Defendants carried out this scheme so as to sell their own shares in Lexar at artificially inflated prices. Id. at 2.

The Complaint focuses on a variety of statements made by Defendants during the class period. For example, in an October 16, 2003 earnings conference call, Defendant Stang, speaking about the market for flash drives, stated, "We see nothing that indicates that it is slowing." Amended Complaint at 8. In a

2

1  January 29, 2004 conference call, Stang referred to "accelerated
2  market growth in 2004." Id. at 9. In the same call, Stang also
3  said that Lexar was "seeing relatively stable industry pricing"
4  and that the company was "forecasting no major price declines."
5  Id. Similarly, Lexar's March 15, 2004 Form 10-K, an annual report
6  filed with the U.S. Securities and Exchange Commission, stated,
7  "In the second half of 2003, prices of flash memory increased as
8  industry wide demand for flash memory outpaced the supply of flash
9  memory, which resulted in a general industry wide shortage. We
10 expect this trend to continue during the first half of 2004." Id.
11 at 10. Plaintiffs allege that such statements were "materially
12 false and misleading when made because they failed to disclose (1)
13 that inventory was collecting at Lexar's warehouses; (2) that
14 Lexar's product sales had slowed precipitously and (3) that this
15 and competition from other companies would cause Lexar to have to
16 slash prices which would result in lower revenues and margins."
17 Id. Lead Plaintiffs seek to buttress these allegations with
18 statements made by a confidential witness who worked at Lexar as
19 an inventory controller. Opposition at 4.
20      In sum, Plaintiffs allege that Lexar's executives made less-
21 than-truthful statements with the purpose of selling stock at
22 artificially inflated prices.

23 **III. <u>LEGAL STANDARD</u>**

24      Under Rule 12(b)(6) of the Federal Rules of Civil Procedure,
25 a party may move for dismissal "for failure to state a claim upon
26 which relief can be granted." When presented with a motion to
27 dismiss, "[a]ll allegations of material fact are taken as true and

3

1  construed in the light most favorable to the nonmoving party."
2  <u>Jacobellis v. State Farm Fire & Cas. Co.</u>, 120 F.3d 171, 172 (9th
3  Cir. 1997).  "[A] complaint should not be dismissed for failure to
4  state a claim unless it appears beyond doubt that the plaintiff
5  can prove no set of facts in support of his claim which would
6  entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46
7  (1957); <u>see also</u> <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 896 (9th
8  Cir. 2002).

9      Plaintiffs' claims are brought pursuant to Sections 10(b) and
10 20(a) of the Exchange Act.  The Private Securities Litigation
11 Reform Act of 1995 ("PSLRA") controls the pleading standards for
12 these claims.  <u>In re Silicon Graphics</u>, 183 F.3d 970, 973 (9th Cir.
13 1999).  Under the PSLRA, a plaintiff "must plead, in great detail,
14 facts that constitute strong circumstantial evidence of
15 deliberately reckless or conscious misconduct."  <u>Id.</u> at 974.  More
16 specifically, a plaintiff "is required to state with particularity
17 all facts giving rise to a 'strong inference' of the required
18 state of mind."  <u>Id.</u> at 983.

19     The Court notes that "an inevitable tension arises between
20 the customary latitude granted the plaintiff on a motion to
21 dismiss under Fed. R. Civ. P. 12(b)(6), and the heightened
22 pleading standard set forth under the PSLRA."  <u>Gompper</u>, 298 F.3d
23 at 896.  The Ninth Circuit, resolving this tension with a tilt
24 toward the heightened pleading standard of the PSLRA, has stated
25 that "to consider only inferences favorable to [plaintiffs']
26 position would be to eviscerate the PSLRA's strong inference
27 requirement."  <u>Id.</u> at 896.  Rather than considering only

28
    4

**United States District Court**
For the Northern District of California

1  inferences in favor of plaintiffs, "the court must consider *all*
2  reasonable inferences to be drawn from the allegations, including
3  inferences unfavorable to the plaintiffs." (emphasis in original)
4  Id. at 897.  In other words, "[t]he heightened pleading
5  requirements of the Private Securities Litigation Reform Act are
6  an unusual deviation from the usually lenient requirements of
7  federal rules pleading."  Ronconi v. Larkin, 253 F.3d 423, 437
8  (9th Cir. 2001).  As stated in Ronconi, "[f]or a securities fraud
9  case based on false statements to survive a motion [to dismiss],
10 the pleading has to state particularized facts that, taken as a
11 whole, raise a strong inference that defendants intentionally or
12 with deliberate recklessness made false or misleading statements
13 to investors."  Id.

### IV.  DISCUSSION

15 "To avoid dismissal under the PSLRA, the Complaint must
16 specify each statement alleged to have been misleading [and] the
17 reason or reasons why the statement is misleading ..."  Nursing
18 Home Pension Fund v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir.
19 2004) (internal citations and quotations omitted).  "In addition,
20 the PSLRA requires that the Complaint state with particularity
21 facts giving rise to a strong inference that the defendant acted
22 with the required state of mind, or scienter."  Id.  (internal
23 citations and quotations omitted).  A complaint must be dismissed
24 if either of these two prongs are not met.  Id.  As discussed in
25 detail below, the Court finds that Plaintiffs have met neither of
26 these two prongs.
27 ///
28

5

A. <u>Alleged misleading statements</u>

Plaintiffs' Complaint details a series of statements made by Lexar executives during the class period. Subsequent events showed the statements to have been, at a minimum, overly optimistic. For example, on January 29, 2004, during an analyst conference call Defendant Stang described "accelerated market growth in 2004" and stated, "We ourselves are forecasting no major price declines." Amended Complaint at 9. Plaintiffs allege that these statements "were materially false and misleading when made because they failed to disclose (1) that inventory was collecting at Lexar's warehouses; (2) that Lexar's product sales had slowed precipitously and (3) that this and competition from other companies would cause Lexar to have to slash prices." <u>Id.</u> at 10. Plaintiffs also point to Lexar's Form 10-K filed with the SEC on March 15, 2004. In the report, Defendants indicated that Lexar expected flash memory prices to increase in the first half of 2004. <u>Id.</u> Plaintiffs allege this was materially false and misleading, pointing to the fact that Lexar slashed its prices only 30 days later. <u>Id.</u> at 11.

The only support which Plaintiffs provide for their allegations of misleading statements is the information provided by "Confidential Witness #1" ("CW-1") and the fact that Lexar announced price cuts for its products on April 15, 2004. Opposition at 7-9. For example, Plaintiffs allege, "According to CW-1, who worked at Lexar as an inventory controller, by late 2003 retailers were no longer buying Lexar products, which caused inventory to build up." Opposition at 7. Plaintiffs also allege,

6

"In fact, according to CW-1, by April 2004, the Company had so much unsold inventory it actually ran out of space to store it." Id.

The Court finds this proffered support for the allegations of misleading statements to be insufficient. A rise in inventories does not necessarily signify slowing sales. Without additional facts, it is no less likely that a rise in inventories signifies growing sales, or an anticipation of growing sales. Plaintiffs invite this Court to view the rise in inventories in a negative light; however, Plaintiffs offer no additional allegations to support such an inference. This Court takes no issue with the use of a confidential source. A complaint in a securities class action may rely on a confidential source as long as the source is described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." In re Daou Systems, Inc., Nos. 02-56989, 02-57018, 2005 WL 1431833, at *4 (9th Cir. June 21, 2005). Furthermore, "[w]here plaintiffs rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." Id. (internal citations and quotations omitted). In the case at hand, the Court agrees that CW-1, as an inventory controller, would possess information relating to rising inventory levels. Rather, the problem with Plaintiffs' allegations is that CW-1 does not provide an adequate basis for believing that the statements were false

7

because the mere fact that inventories increased does not signify by itself that sales were decreasing at the time of the rise. Given the heightened pleading requirements of the PSLRA, something more than ambiguous comments about inventories is necessary. For example, in Nursing Home Pension Fund, the complaint contained "specific statements from former employees and managers ... testifying to a major slowdown in sales." 380 F.3d at 1231. In that case, one former vice president of finance stated that the defendants would have known about the slowdown at least six weeks before they publicly announced it. Id. In the case at hand, the Court finds that Plaintiffs' pleadings do not contain any such specific statements. Similarly, there is nothing unusual in the business world about optimistic forecasts being followed by sudden price declines and a steep stock decline. Under the logic put forth by Plaintiffs, every time the stock market digested a new forecast that resulted in a steep fall in a company's stock price, the executives of that company would be liable for securities fraud. That simply is not how our securities markets function. Almost every day, some company somewhere announces a change in its business forecast that results in a steep fall in the share price. Not every such event gives rise to legal liability. Plaintiffs have failed to put forth any facts which would suggest that such liability exists here.

B.  Alleged scienter

Notwithstanding the above, even if this Court were to accept Plaintiff's allegations of material misleading statements, Plaintiffs have not plead the element of scienter with sufficient

8

1 particularity to defeat the Motion at hand.

2 　　　As a preliminary matter, the Court notes the connection
3 between a § 10(b) claim and a § 20(a) claim.  "Scienter is an
4 essential element of a § 10(b) or Rule 10b-5 claim.  And to
5 prevail on their claims for violations of § 20(a) ..., plaintiffs
6 must first allege a violation of § 10(b) or Rule 10b-5.  Absent
7 pleading scienter with particularity, there can be no liability"
8 on either the § 10(b) claim or the § 20(a) claim.  <u>Lipton v.</u>
9 <u>Pathogenesis Corp.</u>, 284 F.3d 1027, 1035 (9th Cir. 2002) (internal
10 citations and quotations omitted).  In other words, dismissal of
11 the § 10(b) claim necessitates dismissal of the § 20(a) claim as
12 well.  Therefore, the Court will focus its analysis on the § 10(b)
13 claim.

14 　　　Turning to the legal definition of the element of scienter
15 applicable here, the PSLRA's "required state of mind," in 15
16 U.S.C. § 78u-4(b)(2), "refers to the scienter requirement
17 applicable to [a section 10b claim]."  <u>In re Silicon Graphics</u>, 183
18 F.3d at 975.  The PSLRA states, "In any private action arising
19 under this title in which the plaintiff may recover money damages
20 only on proof that the defendant acted with a particular state of
21 mind, the complaint shall ... state with particularity facts
22 giving rise to a strong inference that the defendant acted with
23 the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The Ninth
24 Circuit has held that "the PSLRA language that the particular
25 facts must give rise to a strong inference of the required state
26 of mind [means] that the evidence must create a strong inference
27 of, at a minimum, 'deliberate recklessness.'"  <u>In re Silicon</u>

28

**United States District Court**
For the Northern District of California

Graphics, 183 F.3d at 977 (internal quotations omitted).  A plaintiff bringing a claim controlled by the PSLRA, as Plaintiffs do here, "can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Id. at 979.

In sum, a plaintiff must plead "particular facts giving rise to a strong inference of deliberate or conscious recklessness." Id.  However, there need not be any one fact that by itself shows such recklessness.  Rather, "[i]n assessing whether Plaintiffs have sufficiently pled scienter, [a court] must consider whether the total of plaintiffs allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, 380 F.3d at 1230 (internal citations and quotation omitted).

Plaintiffs have put forth two bases in an effort to meet this standard.  First, Plaintiffs allege that the Defendants had knowledge of the fraud.  Opposition at 10.  Second, Plaintiffs allege that public records detailing insider selling of Lexar stock shows scienter.  Id. at 12.  For the following reasons, the Court disagrees with both arguments.

### 1.  Knowledge of the Fraud

To support their assertion that Defendants had knowledge of the fraud, Plaintiffs make three allegations: 1) that Lexar slashed prices a mere 30 days after announcing it would not, 2) that Defendants made false and misleading statements about

10

1 problems of which they would surely have been aware, and 3) that
2 flash memory is Lexar's only business and therefore senior
3 executives must have known about the fraud. Id. at 10-12.

4     The first allegation, slashing prices a month after a
5 statement that prices were stable, is not by itself evidence of
6 fraud, especially in the technology industry. Ronconi, 253 F.3d
7 at 434 ("Problems and difficulties are the daily work of business
8 people.  That they exist does not make a lie out of any of the
9 alleged false statements.").  The heightened pleading requirements
10 of the PSLRA require some sort of factual allegation that the
11 price slashing was not a sudden development.  Plaintiffs have not
12 put forth any such allegations except for the alleged inventory
13 buildup.  As discussed in detail in the following paragraph, the
14 ambiguous nature of the inventory buildup renders it an
15 insufficient basis for denial of the Motion.

16     Regarding the second allegation, Plaintiffs claim that "a
17 virtual halt in sales for at least six months and a dramatic
18 overstock of inventory to a point that the Company ran out of
19 space to store it were serious enough problems that the Court can
20 infer that Defendants knew about them, or were reckless in not
21 knowing." Opposition at 11.  At a minimum, these statements are
22 speculative exaggeration.  They are certainly not statements which
23 could even remotely qualify as a basis for meeting the heightened
24 pleading standards of the PSLRA.  It is not clear to the Court why
25 Plaintiffs even allege a "virtual halt in sales" since during the
26 class period, Lexar's sales hit record levels. Reply at 4.
27 Nowhere in their papers do Plaintiffs dispute the financial
28

11

statements of Lexar which show record sales.  Nor do they make any allegations that this revenue was improperly recorded.  As for the allegation that there was a "dramatic overstock of inventory," Plaintiffs at least make a minimal effort to provide some factual support--Plaintiffs have put forth statements made by CW-1, the confidential witness.  Opposition at 3.  For example, Plaintiffs allege, "According to CW-1, who worked at Lexar as an inventory controller, by late 2003 retailers were no longer buying Lexar products, which caused inventory to build up."  Opposition at 7.  Plaintiffs also allege, "In fact, according to CW-1, by April 2004, the Company had so much unsold inventory it actually ran out of space to store it."  Id.  It is true that the "most direct way to show ... that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."  Nursing Home Pension Fund, 380 F.3d at 1230.  However, it is not clear here that the statements of CW-1 contradict the statements by Lexar executives.  The Lexar executives stated that the flash memory market was growing due to strong demand.  Increased inventory levels would be exactly what one would expect if executives forecast strong demand.  Were this a traditional motion to dismiss not controlled by the PSLRA, the Court would have to assume as true the Plaintiffs' negative view of the inventory buildup.  However, the PSLRA does control, and under the relevant case law, this Court "must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper, 298 F.3d at 897.  Given that Plaintiffs have provided no

12

support for their claims of an uncontrolled inventory buildup beyond the ambiguous statements of CW-1, who is not described as anything more than an "inventory controller," the Court declines to infer scienter on this basis.

The third allegation made by Plaintiffs to support the claim that Lexar executives had knowledge of the fraud is that flash memory is Lexar's only business and therefore senior executives must have known about the fraud. Plaintiffs rely on In re Peoplesoft, which states that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." No. C 99-00472 WHA, 2000 U.S.Dist. LEXIS 10953, at *11, (N.D. Cal. May 26, 2000) (internal quotations and citation omitted) *citing to* Epstein v. Itron, Inc., 993 F. Supp. 1314, 1325-26 (E.D. Wash. 1998). However, Plaintiffs' allegation of scienter on this basis assumes as true that there was a fraud. Since the Court has rejected, as described above, Plaintiffs' allegations of misleading statements, it would not make sense to infer knowledge of those same misleading statements on the part of Lexar's executives. In other words, because this Court finds Plaintiffs' allegations of fraud to be lacking, there can be no inference of scienter merely because flash memory was Lexar's core business.

Overall, the Court finds that Plaintiffs have not adequately plead scienter based on the theory that Lexar executives had knowledge of the fraud.

///

13

### 2. The Insider Sales

As an alternative means of showing scienter, Plaintiffs state that the Amended Complaint "also raises a strong inference of deliberate action or conscious recklessness by pleading insider sales in material amounts and at suspicious times." Opposition at 12. Under Ninth Circuit law, "[s]tock trades are only suspicious when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Nursing Home Pension Fund, 380 F.3d at 1232 (internal citations and quotation omitted). "To evaluate suspiciousness of stock sales, [a court considers] three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Id.

In the instant case, Plaintiffs point to sales of Lexar stock totaling $8.7 million by Defendant Eric Stang.[1] Opposition at 12. Defendants counter that Stang "sold more stock prior to the class period ... than he did during the longer class period."[2] Motion at 21-22. The other Individual Defendant, McGee, did not sell any stock at all during the class period. Motion at 22. Plaintiffs

---

[1] Plaintiffs also point to stock sales totaling $6.8 million by Chief Technology Officer Petro Estakhri. Opposition at 12. However, stock sales by non-defendants cannot be a basis for establishing scienter unless the non-defendant intended to assist defendants. In re Splash Tech. Holdings, 160 F. Supp. 2d 1059, 1082 (N.D. Cal. 2001) *citing to* In re PetSmart, 61 F. Supp. 2d 982, 1001 (D. Ariz. 1999). Furthermore, Estakhri, similar to Defendant Stang, sold more stock in the three months prior to the class period than in the six month class period itself. Motion at 22.

[2] Defendants' statement is based on a "prior period" of three months, compared with a "class period" of six months. Reply at 14. This provides even more support for Defendants' position.

14

do not dispute these facts.

The fact that one individual defendant did not sell stock during the class period and the other individual defendant sold less stock than he had in the immediately prior period significantly undercuts Plaintiffs' assertion that the insider sales raise an inference of "deliberate action or conscious recklessness." Looking at each of the three factors identified above, the fact that Defendant Stang sold more shares in the three-month period immediately prior to the six-month class period itself suggests that the amount and percentage of shares sold was not indicative of any fraud. Similarly, the same fact suggests that the timing of sales during the class period was not unusual. Finally, it is clear that Defendant Stang's sales were consistent with prior trading. When looking at a similar factual situation, the Ninth Circuit has stated, "Context is important, especially for assessing the weight to attach to the timing of sales." Fischer v. Vantive Corp., 283 F.3d 1079, 1092 (9th Cir. 2002). Given the overall context here of insiders selling shares in a manner similar to periods outside the class period, the Court finds that these stock sales are not suspicious because they are not out of line with earlier transactions. Therefore, the insider sales do not support a showing of scienter.

Furthermore, even if the Court were to assume, for argument's sake, that the stock sales were unusual in their timing or amount, suspicious insider stock sales by themselves do not create liability under the statutes at issue. Rather, "stock sales are helpful only in demonstrating that certain statements were

15

misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." Fischer, 283 F.3d at 1093.  As discussed above, Plaintiffs' underlying allegations of misleading statements are lacking, and "insufficient allegations of fraud elsewhere in the complaint have a spillover effect" on an analysis of insider sales.  Id. Therefore, not only does the Court find that the insider sales are not suspicious, but even if they were suspicious, the Court notes that the underlying allegations are lacking.

In conclusion, the Court finds that the Amended Complaint fails to state a sufficient basis for scienter on the part of the Defendants.

## V.  CONCLUSION

Neither party disputes that Lexar and its executives made optimistic statements about the company's performance that were soon followed by a business slowdown and a dramatic decrease in the stock price.  However, there is nothing unusual or necessarily unlawful about such a fact pattern.  Businessmen are by nature optimistic, and sudden stock price movements are often a sign that the market is digesting new information about a company. Financial markets could hardly function if every significant decline in a company's stock created liability on the part of formerly optimistic executives.  Rather, this fact pattern is only unlawful if the optimistic statements are part of a fraudulent plan.  Plaintiffs here have put forth virtually no evidence to suggest that there was such a fraudulent plan carried out by Lexar's executives.  Plaintiffs merely point to an anonymous

16

source who sheds little light on Plaintiffs' allegations and some far from unusual stock trades by senior management.  Such allegations come nowhere close to meeting the heightened pleading requirements of the PSLRA.  Therefore, the Court hereby GRANTS Defendants' Motion to Dismiss in its entirety and hereby DISMISSES all claims against all Defendants.  The Court also GRANTS Plaintiffs 30 days from the date of this Order to file a new amended complaint, should they choose to do so.

IT IS SO ORDERED.

Dated: July  5 , 2005

                         /s/ Samuel Conti
                        UNITED STATES DISTRICT JUDGE